IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
THIRD JUDICIAL DISTRICT AT ANCHORAGE

| | |
|---|---|
| RECREATIONAL DATA SERVICES, LLC, an Alaska Limited Liability Company,<br><br>Plaintiff,<br><br>v.<br><br>TRIMBLE NAVIGATION LIMITED, a California corporation, CABELA'S INCORPORATED, a Delaware corporation, AT&T MOBILITY, LLC., a Delaware corporation, and ALASCOM, INC., an Alaska corporation ,<br><br>Defendants. | Case No. 3AN-11-________ Civil |

**COMPLAINT**

(Breach of Contract, Breach of Fiduciary Duty, Interference with Contract, Promissory Estoppel, Specific Performance, Fraud, Misrepresentation Punitive Damages, Preliminary and Permanent Injunction)

COMES NOW plaintiff, Recreational Data Services, Inc., an Alaska corporation ("***RDS***"), by and through its attorneys, Frontier Law Group, LLC, and alleges as follows:

1. RDS is an Alaska corporation doing business in Alaska and is legally qualified in all respects to bring this action.

2. Trimble Navigation Limited ("***Trimble***") is a California corporation with business ties to RDS in Alaska and is in all respects subject to the jurisdiction of this Court.

4. Cabela's Incorporated ("***Cabela's***") is a Delaware corporation with business ties to RDS in Alaska and is in all respects subject to the jurisdiction of this Court.

5. Alascom, Inc. ("***Alascom***") is an Alaska corporation doing business in Alaska

FRONTIER LAW GROUP, LLC
333 W. 4th Ave., Ste. 311
Anchorage, Alaska 99501
Ph: (907) 272-9100
Fx: (907) 272-9101

and is in all respects subject to the jurisdiction of this Court.

6. AT&T Mobility, LLC ("***AT&T***") is a Delaware limited liability company registered as a foreign company doing business in Alaska and is in all respects subject to the jurisdiction of this Court.

7. Trimble, Cabela's, Alascom and AT&T are hereinafter referred to jointly as the "***Defendants***" and each as a "***Defendant.***"

## FACTS PERTINENT TO ALL COUNTS

8. RDS was initially formed to research, develop, market and distribute proprietary software solutions designed to benefit recreational consumers, including hunters, fishermen and other outdoor enthusiasts, worldwide.

9. The RDS business model was based on producing a suite of software applications for GPS units and mobile devices based on proprietary and patented[1] technology licensed exclusively to RDS.

10. After conducting extensive market research, RDS executives focused on finding an OEM manufacturer (like Trimble) to develop a proprietary platform capable of using RDS's proprietary suite of applications.

11. That research led RDS executives to meet with Mr. Ken Wineberg, a senior sales executive with Trimble, on or about March 9, 2009.

12. After initial conceptual discussions, Mr. Wineberg expressed his desire to learn more about RDS's products and thereafter, on or about March 11, 2009, Mr.

[1] Attached as Exhibit A is a copy of the patent which is currently under an exclusive license to RDS.

FRONTIER LAW GROUP, LLC
333 W. 4th Ave., Ste. 311
Anchorage, Alaska 99501
Ph: (907) 272-9100
Fx: (907) 272-9101

Wineberg introduced the RDS executive team to Mr. Chaur-Fong Chen, Trimble's Director of Strategic Business Development.

13. Following those meetings, on March 13, 2009, Trimble (through its subsidiary, Tripod Data Systems) and RDS entered into a mutual non-disclosure agreement, a copy of which is attached hereto as Exhibit B (the "***Trimble Agreement***").

14. Once the Trimble Agreement was executed, RDS made full disclosure of its proprietary business model, technology and trade secrets and, later that same day, Mr. Chen obtained corporate approval for proceeding with the joint project[2] (code named the "***Copper Center Project***") from Trimble's directors and chief executive.

15. At that point RDS and Trimble agreed to work as partners to jointly develop and market RDS's products and, on or about, April 6, 2009, Mr. Chen brought in the Trimble Outdoors division of Trimble to facilitate product marketing efforts.

16. Thereafter, on or about May 17, 2009 and as a result of the parties' joint recruiting efforts, Remington Arms Company, LLC ("***Remington***"), joined as a partner in the Copper Center Project and Mr. Chen, on behalf of Trimble, once again obtained corporate approval thereof from the president and board of Trimble.

17. At that time, Trimble and Remington sent representatives to Alaska to attend a partnership, planning and roles meeting in Copper Center Alaska (thus the partnership's Copper Center Project name).

---

[2] Attached as Exhibit C is a copy of the partners' joint presentation material for obtaining approval for forming the partnership and setting out each partner's scope of responsibility.

FRONTIER LAW GROUP, LLC
333 W. 4th Ave., Ste. 311
Anchorage, Alaska 99501
Ph: (907) 272-9100
Fx: (907) 272-9101

18. At that meeting, the partners agreed that Trimble would develop the Project's hardware, Remington would undertake marketing and distribution[3], RDS would provide the software applications and they would jointly seek a third party telecom carrier such as AT&T[4].

19. The parties further agreed that they would conduct weekly partnership meetings to bring the Copper Center Project's products to market on an accelerated basis and Mr. Chen and Trimble Outdoors once again obtained corporate approval from Trimble's CEO to move forward with the partnership.

20. Thereafter, Trimble started putting together a price to manufacture a device that the parties could bring to market and the parties came to the conclusion that it would be more effective to bring a cellular device to the market rather than a simple GPS unit.

21. Trimble also began discussions aimed at acquiring RDS to reduce the three party risk of the Copper Center Project, as well as a tighter coupling of software and hardware.

22. Over the next several months and on various occasions the parties flew to the RDS head-quarters and on each trip the partners moved closer to their launch date for their products.

23. Employees of RDS flew down to Corvallis and met with three Trimble employees to discuss what would be the best way to move forward. At that time, Trimble

[3] The partners agreed at that time that the key marketing target was Cabela's as the former CEO of Remington just took the job as CEO for Cabela's.

[4] Attached as Exhibit D is a copy of an email from Mr. Chen further identifying the partners for the Coper Center Project and the potential role to be played by AT&T or another carrier.

FRONTIER LAW GROUP, LLC
333 W. 4th Ave., Ste. 311
Anchorage, Alaska 99501
Ph: (907) 272-9100
Fx: (907) 272-9101

first proposed an acquisition of RDS as the best way to approach the launch of the project's products. As a result, all of RDS's proprietary information was made available to Trimble to conduct its due diligence and Trimble made a structured proposal to acquire RDS's partnership interest[5]. At the time of these meetings and the days following, RDS was under the assurance that its CEO, COO, and Board supported the partnership and the project's direction.

24. Shortly after the discussion about acquisition and full disclosure of its proprietary trade secrets, RDS began to notice a change in Trimble's attitude and experienced tremendous difficulty getting the senior executives from Trimble to attend previously scheduled partnership meetings.

25. While this new attitude was a concern, Mr. Chen, business development partner's lead on the project, assured us that the partnership was still on track. At this time, RDS was tasked with establishing a business relationship for the partnership with Cabela's and was assured that Trimble was on board. RDS at that stage engaged Paul Miller, the former Chairman of The Freedom Group and a personal friend of Cabela's CEO, as COO, to facilitate that relationship.

26. With the help of Cabela's Tommy Milner, RDS set up a meeting with Cabela's entire senior executive team and entered into a confidentiality agreement covering the Copper Center Project (the "***Cabela's Agreement***"). A copy of the Cabela's Agreement is attached as Exhibit E.

---

[5] Attached as Exhibit F is a copy of the initial proposal prepared by Trimble's executive, Mr. Steve Wolff.

FRONTIER LAW GROUP, LLC
333 W. 4th Ave., Ste. 311
Anchorage, Alaska 99501
Ph: (907) 272-9100
Fx: (907) 272-9101

27. At the same time, Trimble was tasked with producing mock-ups of the device for integration into the new presentation. RDS executives flew from Alaska and Virginia to Denver, and upon landing was informed that Trimble was not in a position to support the Cabela's meeting and in fact needed to resolve internal conflicts. Furthermore, on a call with Trimble's Jim Sheldon, RDS was told that Trimble was no longer pursuing the Copper Center Project with RDS and stated that RDS was free to approach other potential partners.

28. RDS went ahead with the meeting with Cabela's management and discovered that Trimble had copied all of the Copper Center Project software, data and proprietary trade secrets and had launched its own competing product through Cabela's marketing channel.

29. AT&T and Alascom, with full knowledge of the proprietary nature of RDS's technology and Trimble's misappropriation thereof, is now marketing[6], and developing devices to market, RDS's proprietary products in violation of the Cabela's Agreement, the Trimble Agreement, and its own nondisclosure agreement it has in place with the project partners.

30. Likewise, Cabela's is now providing a distribution channel for RDS's proprietary software, data and trade secrets under the Hunt Recon mark through AT&T and Alascom.

[6] Attached as Exhibit G is a copy of page 13 of AT&T's annual report to its shareholders extolling the virtues of its new partnership with Trimble to market RDS's products.

FRONTIER LAW GROUP, LLC
333 W. 4th Ave., Ste. 311
Anchorage, Alaska 99501
Ph: (907) 272-9100
Fx: (907) 272-9101

## COUNT I
## BREACH OF CONTRACT/FIDUCIARY DUTY
*(TRIMBLE - INCLUDING AS 32.06.202)*

31. Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

32. Trimble's failure to honor the terms and conditions of the parties' partnership agreement and the Trimble Agreement was a breach of contract and a violation of the covenant of good faith and fair dealing.

33. As a result of Trimble's breach, RDS has lost the benefit of its bargain, the value of their proprietary information, the investments made in compliance with the partnership agreement and other contracts to perform as agreed, the value of the Copper Center Project and future implementations based thereon.

34. In addition and because of the Trimble's breach, RDS has lost the value of the reasonable profits that RDS was projected to receive as a partner in the Copper Center Project[7] and understood RDS would lose as the foreseeable result of Trimble's failure to keep its promises to RDS.

35. Trimble is a sophisticated business entity which has specific knowledge concerning specialized GPS and related hardware and, prior to breaking its promises to RDS, Trimble had reason to know what the losses would be that RDS would suffer as a result of Trimble's breaches.

36. RDS has suffered economic losses as a result of Trimble's breaches of

[7] Reasonably projected by the partners to be in excess of $111,666,973 for the first five years of production. See Exhibit C, page 7 of 8, bottom line as Trimble's projections for RDS's portion (the software) of the first 5 years of the Copper Center Project operations.

FRONTIER LAW GROUP, LLC
333 W. 4th Ave., Ste. 311
Anchorage, Alaska 99501
Ph: (907) 272-9100
Fx: (907) 272-9101

contract in the amount of not less than $111,666,973, the exact amount to be proven at trial.

## COUNT II
## PROMISSORY ESTOPPEL
*(TRIMBLE)*

37. RDS incorporates all prior paragraphs as though fully set forth herein.

38. The statements and actions of Trimble's agents, attorneys, managers and employees described above promised RDS that RDS had, and would continue to have the benefit of their partnership agreement and the Trimble Agreement, and subsequent software development for the Copper Center Project in the future.

39. RDS relied upon those promises and were induced by those promises to invest hundreds of thousands of dollars in anticipation of performing under the parties' partnership agreement and/or the Trimble Agreement.

40. Trimble knew that RDS would rely upon its promises to make those investments.

41. Defendants knew at the time Plaintiffs were making those investments that those investments were being made.

42. Enforcement of Trimble's promises to RDS is necessary in the interest of justice.

## COUNT III
## INTERFERENCE WITH CONTRACT

43. RDS incorporates all prior paragraphs as though fully set forth herein.

44. Trimble knows, and at all times relevant knew, that RDS was either a party to

FRONTIER LAW GROUP, LLC
333 W. 4th Ave., Ste. 311
Anchorage, Alaska 99501
Ph: (907) 272-9100
Fx: (907) 272-9101

or entitled to perform under the partnership agreement with Remington and/or Cabela's and/or AT&T and each Defendant intended to induce a breach thereof.

45. Defendants have breached their agreements with RDS and each Defendant's wrongful conduct engendered the breach.

46. The breach caused RDS damages and the Defendants' conduct was not privileged or justified.

47. To the extent a Defendant had a direct financial interest in another Defendant's agreement, that Defendant was motivated by spite, malice, or some other improper objective, not by the desire to protect that Defendant's own economic interest.

48. As a result of each Defendants conduct, RDS has been, and in the future will be, economically damaged in the amount of up to, or in excess of $111,666,973.00, plus attorney fees, the exact amount to be proven at trial.

**COUNT IV**
**FRAUD**
*(TRIMBLE)*

49 RDS incorporates all prior paragraphs as though fully set forth herein.

50 The statements and acts of Trimble's agents, attorneys, managers and employees were made intentionally or made with reckless disregard of the consequences to RDS.

51. The misrepresentations made through the statements and acts of Trimble's agents, attorneys, managers and employees were fraudulent and material.

52. RDS reasonably relied upon the misrepresentations of RDS's agents,

FRONTIER LAW GROUP, LLC
333 W. 4th Ave., Ste. 311
Anchorage, Alaska 99501
Ph: (907) 272-9100
Fx: (907) 272-9101

attorneys, managers and employees.

53. RDS's reliance was justified and Trimble's misrepresentations induced RDS into disclosing RDS's proprietary data and business plan and incurring costs in anticipation of performing under the parties' partnership agreement and/or the Trimble Agreement.

54. Trimble's misrepresentations induced RDS reasonably to rely upon Trimble's misrepresentations and to invest hundreds of thousands of dollars in anticipation of performing under the partnership agreement.

55. As a result of RDS's justifiable and reasonable reliance on Trimble's misrepresentations, RDS has been, and in the future will be, economically damaged in the amount of not less than $111,666,973.00, the exact amount to be proven at trial.

**COUNT V**
**NEGLIGENT MISREPRESENTATION**
*(TRIMBLE)*

56. RDS incorporates all prior paragraphs as though fully set forth herein.

57. The misrepresentations made by Trimble's agents, attorneys, managers and employees, described above, were made in the course of each individual's business, profession or employment with Trimble.

58. Each misrepresentation communicated false information to RDS and RDS justifiably relied upon the false information that was communicated to them by Trimble.

59. The above described agents, attorneys, managers and employees of Trimble failed to exercise reasonable care or competence in obtaining or communicating the false information to RDS.

FRONTIER LAW GROUP, LLC
333 W. 4th Ave., Ste. 311
Anchorage, Alaska 99501
Ph: (907) 272-9100
Fx: (907) 272-9101

60. As a result of RDS's justifiable and reasonable reliance on Trimble's misrepresentations, Defendant has been, and in the future will be, economically damaged in the amount of not less than $111,666,973.00, the exact amount to be proven at trial.

**COUNT VI**
**BREACH OF CONTRACT**
*(AT&T, ALASCOM AND CABELA'S)*

61. RDS incorporates all prior paragraphs as though fully set forth herein.

62. The failure of AT&T, Alascom and Cabela's (the "***Marketing Defendants***") to honor the terms and conditions of each such parties' confidentiality agreements was a breach of contract and a violation of the covenant of good faith and fair dealing.

63. As a result of the marketing Defendants' breach, RDS has lost the benefit of its bargain, the value of their proprietary information, the investments made in compliance with the Marketing Defendants' agreements and other contracts to perform as agreed, the value of the Copper Center Project and future implementations based thereon.

64. In addition and because of the Marketing Defendants' breach, RDS has lost the value of the reasonable profits that RDS was projected to receive as a partner in the Copper Center Project and understood that RDS would lose those profits as the foreseeable result of each Marketing Defendants' failure to keep their promises to RDS.

65. The Marketing Defendants are sophisticated business entities which have specific knowledge distribution of software applications and related products and, prior to breaking its promises to RDS, the Marketing Defendants had reason to know what the losses would be that RDS would suffer as a result of those breaches.

FRONTIER LAW GROUP, LLC
333 W. 4th Ave., Ste. 311
Anchorage, Alaska 99501
Ph: (907) 272-9100
Fx: (907) 272-9101

66. RDS has suffered economic losses as a result of the Marketing Defendants' breaches of contract in the amount of not less than $111,666,973, the exact amount to be proven at trial.

## COUNT VII
## PROMISSORY ESTOPPEL
*(MARKETING DEFENDANTS)*

67. RDS incorporates all prior paragraphs as though fully set forth herein.

68. The statements and actions of the Marketing Defendants' agents, attorneys, managers and employees described above promised RDS that RDS had, and would continue to have the benefit of their partnership agreement and related agreements, and subsequent software development for the Copper Center Project in the future.

69. RDS relied upon those promises and were induced by those promises to invest hundreds of thousands of dollars in anticipation of performing under the parties' partnership agreement and related agreements.

70. The Marketing Defendants' knew that RDS would rely upon its promises to make those investments.

71. The marketing Defendants knew at the time RDS was making those investments that those investments were being made.

72. Enforcement of Marketing Defendants' promises to RDS is necessary in the interest of justice.

## COUNT VIII
## PUNITIVE DAMAGES

FRONTIER LAW GROUP, LLC
333 W. 4th Ave., Ste. 311
Anchorage, Alaska 99501
Ph: (907) 272-9100
Fx: (907) 272-9101

73. Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

74. The breaches of duty, and misrepresentation set forth in the preceding paragraphs were intentional, outrageous, and made with reckless indifference to the rights of Plaintiffs such that an award of punitive damages is appropriate.

## COUNT IX
## SPECIFIC ENFORCEMENT, PRELIMINARY AND PERMANENT INJUNCTION

75. Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

76. Defendants have deprived RDS of the benefit of its bargain to perform under the parties' various agreements.

77. Should Defendants be successful, RDS's business in the limited market will be usurped by the Defendants, hundreds of millions of dollars in potential profits will be wasted and RDS will be caused irreparable and financially fatal injury from which RDS could not, and will not, recover.

78. Should the Court fail to specifically enforce and/or enjoin Defendants from continuing to breach each such defendant's respective agreement (in accordance with the terms thereof) with RDS, Defendant will continue to receive the benefits of the RDS's proprietary software in violation of their respective agreements and RDS will continue to suffer irreparable harm for which money damages alone will not be sufficient.

## PRAYER FOR RELIEF

Wherefore Plaintiffs pray for relief as follows:

1. Plaintiffs pray for an award of general, past and future economic, and

FRONTIER LAW GROUP, LLC
333 W. 4th Ave., Ste. 311
Anchorage, Alaska 99501
Ph: (907) 272-9100
Fx: (907) 272-9101

other direct damages in the amount to be proven at trial.

2. Plaintiffs pray for an award of indirect, special, consequential, exemplary, extraordinary and/or punitive damages in the amount to be proven at trial.

3. Plaintiffs' pray for an award of damages for fraud in the amount, plus punitive damages in the amounts to be proven at trial.

4. Plaintiffs pray for the return of its investments of in the amount to be proven at trial.

5. Plaintiffs pray for a preliminary and permanent injunction to specifically enforce the parties' agreement and/or Contract until such time as the Court shall decide the issues in this case then later.

6. Plaintiffs pray that the court award such costs, interest and attorneys fees to which they are entitled under law, and

7. Plaintiff prays that the Court award then such other relief they are entitled to under law.

DATED this 2nd day of September 2011.

FRONTIER LAW GROUP LLC

By: ____________________
Christopher D. Cyphers, Alaska Bar No. 9812085
Attorneys for Plaintiffs, Recreation Data Services, Inc.

FRONTIER LAW GROUP, LLC
333 W. 4th Ave., Ste. 311
Anchorage, Alaska 99501
Ph: (907) 272-9100
Fx: (907) 272-9101

US006459372B1

(12) **United States Patent**
Branham et al.

(10) Patent No.: **US 6,459,372 B1**
(45) Date of Patent: **Oct. 1, 2002**

(54) **HAND-HELD COMPUTER FOR IDENTIFYING HUNTING AND FISHING AREAS AND DISPLAYING CONTROLLING REGULATIONS PERTAINING THERETO**

(76) Inventors: **Devin Branham**, 100 Gail Dr., Wasilla, AK (US) 99654; **James Belz**, 100 Gail Dr., Wasilla, AK (US) 99654

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/867,887**

(22) Filed: **May 29, 2001**

(51) Int. Cl.[7] .................... **G08B 1/08**

(52) U.S. Cl. .............. **340/539**; 340/573.1; 340/573.2; 340/989; 340/990; 340/691.6

(58) Field of Search .................... 340/539, 573.1, 340/573.2, 989, 990, 825.3, 691.6, 286.02

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,597,069 A * 6/1986 Milano et al. .............. 367/95
5,594,707 A * 1/1997 Goto et al. .............. 367/111
6,002,644 A * 12/1999 Wilk .............. 367/131
6,102,406 A * 8/2000 Miles et al. .............. 273/430
6,170,189 B1 * 1/2001 Klein .............. 43/17
6,222,449 B1 * 4/2001 Twining .............. 345/539

* cited by examiner

*Primary Examiner*—Jeffery Hofsass
*Assistant Examiner*—Daniel Previl
(74) *Attorney, Agent, or Firm*—Michael J. Javella

(57) **ABSTRACT**

A device that monitors a person's location and compares it to a database of fish and game regulations for a given area. The user can verify position, but can also display fish and game regulations that apply in that area. Moreover, the unit can also monitor the user's position with respect to boundaries. If the user crosses into another area, the unit can alert the user of this and the user can then discover the rules for the area and if necessary, leave the area. In this way, hunters and fishers can now travel through the back country confident that they always know the regulations and boundaries of the areas that they occupy.

**10 Claims, 12 Drawing Sheets**

Figure 1

EXHIBIT A
Page 1 of 10



FIGURE 2



Figure 3

EXHIBIT A
Page 2 of 10



U.S. Patent Oct. 1, 2002 Sheet 4 of 12 US 6,459,372 B1

70
71
72
73
74
75
76
77
78
79
80
81
82
83
84
PAGE
QUIT
Zoom
3.0
Pan
SHIRLEY TOWN
TRACK
096
SPEED
0.0
TRIP
36.6
ALT
244
10:04:45 AM
02 03 08 10 19 31
MENU
HUNTING REGULATIONS
FISHING REGULATIONS
NEAREST WAYPOINTS
WAYPOINT LIST
WAYPOINT
ROUTES
MESSAGES
LOCATION: WILLOW CREEK
FISH TYPE
FULL REGULATIONS
METHOD OF FISHING
ANIMAL TYPE
WEAPON TYPE
INTERFACE
WAITING FOR DOWNLOAD...
CHINOOK
COHO
CHUM
PINK
RAINBOW TROUT
DOLLY VARDEN
GRAYLING
STEELHEAD
NO RETENTION ALLOWED
CATCH & RELEASE ONLY
SINGLE HOOK
NO BAIT
RESIDENT & NONRESIDENT
ONE BULL WITH SPIKE FORK ANTLERS OR ANTLERS WITH 3 OR MORE BROW TINES OR 50" ANTLERS
AUG 20TH-SEPT 25TH
OR
DEC 5 DEC 15TH

FIGURE 4

U.S. Patent Oct. 1, 2002 Sheet 5 of 12 US 6,459,372 B1

98
SATELITE
SATELITE
SATELITE
ANT
97
96
PC PORT
95
MEMORY CARD
90
BATTERY
92
MEMORY
GPS
93
DISPLAY
PROCESSOR
94
KEYBOARD
53
91
52

Figure 5

EXHIBIT A
Page 3 of 10

EXHIBIT D
17 of 47



Figure 6

Figure 7

EXHIBIT A
Page 4 of 10



U.S. Patent Oct. 1, 2002 Sheet 8 of 12 US 6,459,372 B1

Start
100
Main Menu
101
Outdoor Menu
130
Restrictions
134
Land Use
131
Reports
132
Weather
133
Processor
91
Answer for where unit is
53
Down Loads and Special Alert
108
GPS
93
Map Software
110
Data Base
108a
Weather Band
136

Figure 8

U.S. Patent Oct. 1, 2002 Sheet 9 of 12 US 6,459,372 B1

Start
100
Main Menu
101
messages
139
Processor
91
Data Base
108a
GPS
93
Down Loads and Special Alert
108
Map Software
110
Data Base Cards
95
Any Message from Alerts, Position To Errors
53
Weather Band
136
Fishing Regulations
Hunting Regulations
107

Figure 9

EXHIBIT A
Page 5 of 10

EXHIBIT D
19 of 47

Figure 10

Figure 11

EXHIBIT A
Page 6 of 10

Vendor Computer 174
Internet 173
P. C. Port 172
Processor 91
Memory Card 95
Database 108a
Database 108a
Interface 170
Memory Cards 95
Main Menu 101
Start 100

Figure 12

# HAND-HELD COMPUTER FOR IDENTIFYING HUNTING AND FISHING AREAS AND DISPLAYING CONTROLLING REGULATIONS PERTAINING THERETO

## CROSS REFERENCE TO RELATED APPLICATIONS

Not Applicable

## STATEMENT REGARDING FEDERALLY SPONSORED RESEARCH AND DEVELOPMENT

Not applicable

## BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates to portable Global Positioning Satellite (GPS) systems and particularly to GPS systems that locate hunters and fishers with respect to hunting and fishing areas to ensure compliance with published regulations.

2. Description of the Prior Art

Hunting and fishing these days requires an outdoors person to be familiar with many pages of complex regulations. Boundaries are established for hunting and fishing that permit or forbid people in engaging these activities. Often, what is legal in one area is illegal in the adjacent areas. Many times hunters of fishers cross these boundaries unexpectedly, placing them in violation of the rules. Within an approved area the number, size and type of fish or animals available for hunting varies from location and with the seasons-and sometimes by days of the week. Many times violations carry penalties from small fines to arrest and imprisonment. Therefore, it is every outdoor person's responsibility to be knowledgeable of these rules and to know where they are at any time within a particular game or fish unit.

With the volume of information, it is very difficult for the average outdoor person to be totally familiar with the rules and even more, with the specific boundaries of the various fish and game units.

Within the last few years a new type of locator has been developed. The Global Positioning Satellite system (GPS system) uses a number of satellites to locate one's position. All that is needed is a receiver and the person can know within a few feet, exactly where he or she is. Early systems gave readouts in latitude and longitude positions. Although helpful, one needs a map to be able to know where one is in relation to boundaries. Further developments if GPS systems produced handheld units that translate the satellite data into readable maps.

Despite these improvements, there is no device that ties the mapping information to fish and game regulations and units.

## BRIEF DESCRIPTION OF THE INVENTION

This invention uses the Global Positioning system in conjunction with a map database that acts as an interfaces with a memory card/disc/cartridge database that is capable of Internet downloads. The system can have multiple languages. The databases include current hunting and fishing regulations, park boundaries, and other special areas of interest.

This system has an alert function that alerts the user by audible alarm, screen flash, color change or vibration to any change in location, regulation changes, hazards or time changes. The alarm is programmable and allows the user to select the alarm settings from a menu.

As noted, the alarms can be programmed to alert the user to regulation changes, entering or approaching a different hunting/fishing boundary, unit or sub unit, shooting/fishing hours (sunrise/sunset), camping restrictions, campfire restrictions, bait restrictions, weapon/lure restrictions, shooting restrictions, park boundaries, preserve boundaries, refuges, public access areas or lack of, bag limit changes, hazardous areas (e.g., avalanche warnings, thin ice, high fire danger, weather warnings), vehicle restrictions, private property, Federal land, and State land locations.

Hunting regulations are stored on a card/disc/cartridge for each state/country/province. Regulations can be stored in multiple languages. Regulations for database cards already owned are updated via the Internet or vendor download. Regulations are listed in their entirety and are accessible by scroll down menu, species, location, weapon, date and time in relation to your current position.

Fishing Regulations are also stored on a card/disc/cartridge for each state/country/province. These regulations can be also in multiple languages. As above, these database cards already owned are updated via the Internet or be vendor download. Regulations are listed in their entirety and is accessible by scroll down menu, species, location, method of fishing, date and time in relation to your current position. Moreover, the system tells the user if a lake, stream or beach has public access and directions to where it is.

The system may also have a recreational guide area that allows the down loading of snow conditions, fishing reports, flood warnings, surf reports etc, which may be used in conjunction with the radio weather band, for example, to bring real time conditions to the user.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a plan view of the basic embodiment of the invention.

FIG. 2 is a detail view of menus and screens available on the basic embodiment of the invention.

FIG. 3 is a plan view of the advanced embodiment of the invention.

FIG. 4 is a detail view of menus and screens available on the advanced embodiment of the invention.

FIG. 5 is a schematic block diagram showing the major system components.

FIG. 6 is a flow chart showing the fishing regulations menu.

FIG. 7 is a flow chart showing the hunting regulations menu.

FIG. 8 is a flow chart showing the outdoor menu.

FIG. 9 is a flow chart showing the message menu.

FIG. 10 is a flow chart showing the alert mode menu.

FIG. 11 is a flow chart showing the map menu.

FIG. 12 is a flow chart showing the interface menu diagram.

## DETAILED DESCRIPTION OF THE INVENTION

Referring now to FIG. 1, the front control panel and display for the basic embodiment 1 of the device is shown. The device 1 has a housing 2 that is waterproof and, in the preferred embodiment, is nitrogen filled. At the top of the

EXHIBIT A
Page 7 of 10

housing 2 is a screen 3. The screen 3 is a liquid crystal display that is common to the art; however, other types of displays can be used as well. The screen 3 is designed to show images, such as a simple map as shown in FIG. 1, data as discussed below, or both, as shown in FIG. 3. The operating controls are located under the screen as shown. These include: a power button 4 (on/off); an "enter" button 5, which is used to select items from the various menus as discussed below; a page button 6, which is used to select a desired screen, as discussed below; four scroll buttons: 7a, scroll up, 7b, scroll down, 7c scroll right, and 7d scroll left; a speaker 8, which is waterproof; and a "light" button 9, which is used to operate a back light for the screen in low light conditions.

As shown in FIG. 1, the screen is displaying map page. The map shows typical geographic features, such as a creek 10, roads 11 and hills 12.

FIG. 2 is a table showing the screens and displays for the basic embodiment of FIG. 1. The user presses the "page" button 6 to scroll around the various pages. As shown, FIG. 2 is a chart showing the flow between the various pages. At the top of the chart is the page button 6. The first page displayed is the menu page 20. As shown, the menu page has a number of selections including: messages, map page, fishing regulations, hunting regulations, alarm setting, interface, and outdoor. The selections are made by using the scroll buttons to move down or up on the page until the desired menu item is highlighted. Then, the user presses the enter button 5 to make the selection and move to the desired page.

In the top left center of FIG. 2 is the fishing regulations page 21. As shown, it has titles including location, species, and method. The location page is shown as 22, the species page is shown as 23. Note that the species page has a subpage 24 that shows a page explaining the rules for one of the species shown (in this case, pike). The method page is shown as 25. Again, this page also has a number of sub pages. Here, page 26 displays the rules for using a single hook.

At the top right center of FIG. 2 is the hunting regulations page 27. As shown, it has titles including location, species, and weapon type. The location page is shown as 28, the species page is shown as 29. Note that like the fishing pages, the hunting species page has a subpage 30 that shows a page explaining the rules for one of the species shown (in this case, black bear). The weapon page is shown as 31. Again, this page also has a number of sub pages. For example, FIG. 2 show a display for page 32 that shows the rules for using a rifle. Note that this page actually lists all animals that can be taken at the time and place specified using, in this case, a rifle. The animals are listed alphabetically and the entire list can be viewed using the scroll key. As shown, the figure lists black bear as being an eligible species for rifles for the sates specified.

The alarm settings page 33 is next. On this page, the alarm can be set for different categories, such as fishing, hunting, outdoors and type. The type page is shown as page 34. It includes selections as audible, motion or screen. The hunting alarms are shown on page 35. The fishing alarms are shown on page 36. The outdoor alarms are shown on page 37 and include things such as avalanche danger, vehicle restrictions and park boundaries.

The interface page is shown as page 38. It includes selections such as the main database and connections to a memory card. A sub screen that displays status of the interface is shown as page 39.

The messages screen is shown as page 40. This screen provides the user with status and update information. Finally, the map page is shown as page 41. Here, the page shows viewing controls such as pan and zoom for the user's convenience.

Referring now to FIG. 3, the front control panel and display for the preferred embodiment 50 of the device is shown. The device 51 has a housing 52 that is waterproof and, in the preferred embodiment, is nitrogen filled. At the top of the housing 52 is a screen 53. The screen 53 is a liquid crystal display that is common to the art. The screen 53 is designed to show images, such as the map as shown in FIG. 3, and data as discussed below. In the preferred embodiment, the map shown in FIG. 3 has information as to place names and other information useful to the user. The operating controls in this embodiment are located under the screen and include additional buttons. The preferred controls include: a "quit" button 54, which returns the user to the menu page and if pressed and held turns the unit on or off; an "enter" button 55, which is used to select items from the various menus as discussed below; a page button 56, which is used to select a desired screen, as discussed below; four scroll buttons: 57a, scroll up, 57b, scroll down, 57c scroll right, and 57d scroll left; a speaker 58, which is waterproof; a "light" button 59, which is used to operate a back light for the screen in low light conditions; a "mark" button 60, which is used to enter a way point or mark a position relevant to the user; and a "goto" button 61, which is used to plot a return route to a previously entered way point. The screen 53 also displays two additional pieces of information; the location of the user 62 and a scroll prompt 63.

As in FIG. 1, the screen 53 is displaying map page in FIG. 3. Note here that the map not only shows typical geographic features, such as a creek, roads and hills. It also labels these features.

FIG. 4 is a table showing the screens and displays for the preferred embodiment of FIG. 3. As before, the user presses the "page" button 56 to scroll around the various pages. The user also has other options for scrolling as well. The "quit" button 54 is used to return the user to the main menu page. As shown, FIG. 4 is a chart showing the flow between the various pages. At the top of the chart is the page button 56. The main displays available are shown at the top of the figure. The first is satellite acquisition page 70. The next is an information page 71, showing speed, altitude, position and time. The next is the map page 72 showing the zoom and pan controls. The next is a compass page 73 showing the direction to a particular destination. These display pages 70–73 are display pages typically found on standard GPS receivers.

The last display on the top section is the menu page 74. The menu page 74 is shown below these pages in the center of the figure. As shown, the menu page 74 has a number of selections including: messages, way point lists, fishing regulations, hunting regulations, a system setup page, and a routes page The selections are made by using the scroll buttons to move down or up on the page until the desired menu item is highlighted. Then, the user presses the enter button 55 to make the selection and move to the desired page.

At the left of FIG. 4 is the fishing regulations page 75. As shown, it has titles including location, species, and method. The fish type page is shown as 76. A subpage 77 shows the rules for the species shown (in this case, rainbow trout). Next to the fishing regulations page is the hunting regulations page 78. As shown, it has titles including unit/subunit,

Animal type, and weapon type. Below that is a sample of the animal type page 79. Below that is a page is weapon page 80. This page has a number of sub pages. Here, page 81 displays the rules for using a rifle.

The alarm settings page 82 is shown below the main menu page. On this page, the alarm can be set for different categories, such as audible, motion or screen. The outdoor alarms are shown on page 83 and include things, such as hazards, public access restrictions and boundaries.

The interface page is shown as page 84. It includes selections such as the main database and connections to a memory card. The page shown displays status of the interface.

The messages screen is not shown. However, it operates in the same manner as that of the first embodiment.

Note that these screens and displays are representative of the preferred embodiment. However, their exact design, listing order, categories and other aspects are not limited to those shown. Any particular page layout or design that encompasses these particular functions is intended to be included within the scope of this design.

Referring now to FIG. 5, a block diagram of the preferred embodiment is shown. In this figure, the housing 52 is represented by the dashed line. Within the housing 52 are a battery 90 a central processor 91 a memory storage unit 92 a GPS system 93 the input keys 94 (labeled as "keyboard") and the display screem 53. These components are assembled and connected using techniques well know in the art. The housing 52 also has a memory card reader 95 and a PC port 96. Both of these elements are shown partially extending beyond the dashed line to indicate that these elements attach to components outside of the housing. The GPS system is attached to an antenna 97, also using techniques well known in the art. As is customary, the antenna 97 receives signals from one or more global positioning satellites 98. These signals provide location data that are used by the system to inform the user of both position and what regulations and restriction apply in that area.

FIG. 6 is a flowchart diagram of fishing regulations menu system. The operational steps are as follows. The user begins at start 100. Start calls up the main menu 101 on the display. Using the scroll keys and enter buttons, the user selects the fishing regulations menu 102 from the main menu 101. From there, the user has four choices: a "scroll regulations" selection 103, a location selection 104, a method selection 105 and a species selection 106. If the user wants information about the regulations for a particular species in a given area, the user selects the species line and then selects the particular species from the menu. The processor 91 downloads the location information from the GPS system 93; it then uses that information to determine the regulations unit the user is in, including referring to the map software module 110. The processor then cross-references with the regulations database 107 and the special downloads and alerts database 108. The unit then displays all pertinent information about that species at that location on that day.

If the user selects method, the method menu gives choices as to the type of equipment that can be used, such as pole, lure and bait types. If the user wants information about the regulations for a particular fishing method in a given area, the user selects the method line and then selects the particular method from the menu. The processor 91 downloads the location information from the GPS system 93; it then uses that information to determine the regulations unit for that location. The processor then cross-references with the regulations database 107 and the special downloads and alerts database 108. The unit then displays all pertinent information about that fishing method at that location on that day.

If the user chooses the location selection, the user selects the location line from the menu. The processor 91 downloads the location information from the GPS system 93; it then uses that information to determine the regulations unit for that location. The processor then cross-references with the regulations database 107 and the special downloads and alerts database 108. The unit then displays all pertinent information about fishing at that location on that day.

Finally, if the user selects "scroll regulations" from the menu, the processor brings up all fishing regulations and special alerts pertaining to fishing and allows the user to browse them.

FIG. 7 is a flowchart diagram of hunting regulations menu system. The operational steps are as follows. The user begins at start 100. Start calls up the main menu 101 on the display. Using the scroll keys and enter buttons, the user selects the hunting regulations menu 120 from the main menu 101. From there, the user has four choices: a "scroll regulations" selection 123, an animal type selection 124, a date selection 125, a means or method selection 126 and a geographic boundary selection 127.

If the user wants information about the regulations for a particular animal type in a given area, the user selects the animal type line and then selects the particular animal type from that menu. The processor 91 downloads the location information from the GPS system 93; it then uses that information to determine the regulations unit the user is in, including referring to the map software module 110. The processor then cross-references with the regulations database 107 and the special downloads and alerts database 108. The unit then displays, on display 53, all pertinent information about that animal type at that location on that day.

If the user selects the date line, the processor obtains information for the GPS system, map software, and hunting regulations database. The device that displays information on hunting in the particular geographic area for that date and time.

If the user selects means or method, the menu gives choices as to the type of type of weapon that can be used, such as bow, rifle, shotgun or pistol. The user then selects the type of weapon from the menu. Next, the processor 91 downloads the location information from the GPS system 93 and mapping software. It then uses that information to determine the regulations unit for that location. The processor then cross-references with the regulations database 107 and the special downloads and alerts database 108. The unit then displays all pertinent information about using the particular weapon in that location on that day.

If the user selects the geographic location selection from the menu, the processor 91 downloads the location information from the mapping software and GPS system 93; it then uses that information to determine the regulations unit for that location. The processor then cross-references with the regulations database 107 and the special downloads and alerts database 108. The unit then displays all pertinent information hunting regulations for that location on that day.

Finally, if the user selects "scroll regulations" from the menu, the processor brings up all hunting regulations and special alerts pertaining to hunting and allows the user to browse them.

In some menus (e.g., in FIG. 2.) there is an "outdoor" selection on the main menu. FIG. 8 is a flowchart of selections and options typically available on that menu. As

EXHIBIT A

Page 8 of 10

before, the user begins at start **100** and chooses the main menu **101** from the selections. From the main menu, the uses selects "outdoor" and presses the enter key. The outdoor menu **130** is then displayed. The outdoor menu has four options: land use **131**, reports **132**, weather **133** and restrictions **134**. If the user selects land use **131**, the processor gets information from the GPS and mapping software as to the location of the unit. The processor then cross-references the database and special alerts and dowloads. The unit then displays the land use policies and restrictions for that location.

IF the user selects reports **132**, the processor gets information from the GPS and mapping software as to the location of the unit. The processor then cross-references the database and special alerts and downloads. The unit then displays any reports for that location. Reports can include snow reports, avalanche reports, surf conditions, tides etc.

If the user selects restrictions **134**, the processor gets information from the GPS and mapping software as to the location of the unit. The processor then cross-references the database and special alerts and downloads. The unit then displays known restrictions for that location. Restrictions can include vehicle restrictions, campfire restrictions, etc.

If the user selects weather **133** from the menu, the processor gets information from the GPS and mapping software as to the location of the unit. The unit also can have the ability to tune into the weather band **136** to receive up to date forecasts. The processor then cross-references the special alerts and downloads database **108**. The unit then displays weather warnings and weather reports for that location on the display **53**.

FIG. **9** is a flow chart representation of the messages menu. As before, the user begins at start **100** and selects the main menu **101**. From the main menu, the user selects messages **139**. The messages menu includes information from the database **108***a*, database cards **108***b*, the GPS system **93**, weather band **136**, hunting and fishing regulations **107**, the downloads and alerts **108** and map software module **110**. This information, ranging from simple informational messages to alerts is then displayed on the display **53** in response to an alert or alarm status. For example, if a hunter crosses from one hunting unit to another, an alarm can sound (if the user has programmed it so). Checking the messages menu shows the hunter that the hunter has passed from one unit to another and that the regulations must be checked to determine legal hunting status in the new unit.

FIG. **10** is a flowchart description of the alert menu. As before, the user begins at start **100**, then selects main menu **101**. From the main menu, the user selects "set alert mode" **140**. The "set alert mode" menu gives the user three choices: set fishing alert **141**, set outdoor alert **142**, and set hunting alert **143**. If the user selects any of the three alert modes, the screens display appropriate parameters that define the alert requirements. If the unit goes outside of the selected parameters, shown in the figure as **150**, the unit activates the alert system **151** and advises the user of the alert condition by either an audio alarm, a vibration, or a flashing screen. The FIGS. **2** and **4** show examples of some of these parameters for the fishing and hunting parameters. For the outdoor alerts, the restrictions are such things as camping, campfire restrictions, and weather alerts.

All the alert modes use information obtained from the GPS system **93**, the special alert and downloads and alerts database **108**, weather band **136**, and hunting and fishing regulations **107** to configure the alert based on the parameters selected. These are then ties to the processor **91**, which monitors the selected parameters for an out of parameter reading. For example, hunting and fishing seasons are typically date and time sensitive. By setting the alert to date and time, the unit can alert a user when the time for fishing is over for that date.

FIG. **11** is a flowchart diagram of the map menu. Here, as before, the user selects start **100**, and then the main menu **101**. From the main menu then selects the map selection **160**. This then engages the processor **91** to acquire a position using the GPS system **93** and the map software module **110** to display a details map of the user's location on the display **53**.

FIG. **12** is a flowchart diagram of the interface menu. The interface selection allows the user to download new information into the unit. New information can include emergency orders, warnings updated regulations, and new mapping databases. The downloads can be made to the internal database memory or to memory cards.

As before, the user selects start **100**, and then the main menu **101**. From the main menu, the user chooses the interface selection **170**. The user then has a choice between internal database storage **108***a* and a memory card **95**. Downloads are typically obtained through a P.C. port **172** to a base computer that has access to the Internet **173**, or vendor computers **174**. The information can then be stored on the desired medium either the database **108***a* or the memory card **95** for later use.

The device can be used in many different ways. In the case of the first embodiment, the simpler system does not allow many of the higher level functions of the preferred embodiment; however, it is still useful as a basic guide. A user can be in the field, hunting or fishing. The user can at any time, check position and determine the regulations for that area. If the user crosses a boundary, the alarm can signal this and the user can then check to see what regulations apply in the new area. Similarly, the user can check, weather, camping guidelines, and other databases while in the field.

The device also lets the user update the information in the system by either direct downloads from the Internet or by using memory cards. Thus, the regulations and boundaries can be updated annually, or during the season-if emergency regulations are issued. In this way, the user can be assured that he or she is in compliance with the particular regulations at all times while in the field.

Moreover, the unit's basic GPS capabilities also ensure that the user always knows his or her correct position and prevents the user from becoming lost in the field.

The present disclosure should not be construed in any limited sense other than that limited by the scope of the claims having regard to the teachings herein and the prior art being apparent with the preferred form of the invention disclosed herein and which reveals details of structure of a preferred form necessary for a better understanding of the invention and may be subject to change by skilled persons within the scope of the invention without departing from the concept thereof.

We claim:

1. A hand-held computer for identifying hunting and fishing areas and displaying controlling regulations pertaining thereto comprising:

a) a housing;

b) a display screen, installed in said housing;

c) a plurality of operating keys; attached to said housing;

d) a central processing unit, in operative connection with said display screen and said plurality of operating keys, installed within said housing;

e) a memory unit, in operative communication with said central processing unit;

f) a database, stored in said memory unit, whereby said database includes a set of regulations for hunting and fishing for a designated area;

g) a global positioning satellite receiver, installed in said housing and in operative communication with said central processing unit, whereby said global positioning satellite receiver provides a geographic position to said central processing unit and further whereby said central processing unit uses the geographic position to extract a set of regulations for hunting and fishing for that geographic position and causes said set of regulations to be displayed on said display screen; and

h) an alarm system, in operable communication with said central processing unit whereby when said central processing unit detects a change in a position of a user from a first regulated unit to a second regulated unit, said central processing unit causes said alarm system to alert said user to said change in position.

2. The hand held computer of claim 1 wherein the database further contains information selected from the group of: camping restrictions, campfire restrictions, bait restrictions, weapon/lure restrictions, shooting restrieitions, park boundaries, preserve boundaries, refuges, public access areas, hazardous areas warnings, and vehicle restrictions.

3. The hand held computer of claim 1 further comprising a means for updating information stored in said database.

4. The hand-held computer of claim 3 wherein the means for updating information stored in said database comprise a memory card, wherein said memory card has updated information stored thereon.

5. The hand-held computer of claim 3 wherein the means for updating information stored in said database comprises:

a) an internet website, wherein said internet website has updated information that is downloadable to a host computer; and

b) an interface, in operable communication with said host computer and said hand-held computer to allow information transfers from said host computer to said hand-held computer.

6. A hand-held computer for identifying hunting and fishing areas and displaying controlling regulations pertaining thereto comprising:

a) a housing;

b) a display screen, installed in said housing;

c) a plurality of operating keys; attached to said housing;

d) a central processing unit, in operative connection with said display screen and said plurality of operating keys, installed within said housing;

e) a memory unit, in operative communication with said central processing unit;

f) a database, stored in said memory unit, whereby said database includes a set of regulations for hunting and fishing for a designated area;

g) a global positioning satellite receiver, installed in said housing and in operative communication with said central processing unit, whereby said global positioning satellite receiver provides a geographic position to said central processing unit and further whereby said central processing unit uses the geographic position to extract a set of regulations for hunting and fishing for that geographic position and causes said set of regulations to be displayed on said display screen; and

h) a programmable alarm system having a plurality of alarm settings, wherein said programmable alarm system is programmed to provide a warning signal in response to variations in a user's position that moves a user from a first regulation unit to a second regulation unit.

7. The hand-held computer of claim 6 wherein the plurality of alarm settings is selected from the group of: changes in a hunting boundary, changes in a fishing boundary, changes in hunting hours, changes in fishing hours, camping restrictions, campfire restrictions, bait restrictions, weapon restrictions, lure restrictions, shooting restrictions, park boundaries, preserve boundaries, refuges, public access areas or lack of, bag limit changes, hazardous areas, vehicle restrictions, private property, federal land, or state land locations.

8. A method of obtaining information regarding hunting or fishing regulations in a given area utilizing a hand-held computer that has a housing; an alarm system; a display screen, installed in said housing; plurality of operating keys; attached to said housing; a central processing unit, in operative connection with said display screen and said plurality of operating keys, installed within said housing; a memory unit, in operative communication with said central processing unit; a database, stored in said memory unit, whereby said database includes a set of regulations for hunting and fishing for a designated area; and a global positioning satellite receiver, installed in said housing and in operative communication with said central processing unit, whereby said global positioning satellite receiver provides a geographic position to said central processing unit and further whereby said central processing unit uses the geographic position to extract a set of regulations for hunting and fishing for that geographic position and causes said set of regulations to be displayed on said display screen, comprising the steps of:

a) storing a set of hunting regulations in said database;

b) storing a set of fishing regulations in said database;

c) storing location information applicable to said sets of hunting and fishing regulations in said database;

d) transporting said hand-held computer to a given field location;

e) using said global positioning satellite receiver installed in said hand-held computer to determine an exact position of said hand-held computer;

f) using said location information stored in said database to determine applicable regulations for hunting and fishing for the exact position identified by the global positioning satellite receiver;

g) setting the alarm system to indicate an alert condition, whereby said alert condition being activated when said hand-held computer is moved from a first regulated area to a second regulated area; and

h) having said alarm system signal a user when said hand-held computer moves from said first regulated area to a second regulated area.

9. The method of obtaining information regarding hunting or fishing regulations in a given area utilizing a hand-held computer of claim 8 further comprising the steps of:

a) programming said programmable alarm system with a plurality of warning indicators regarding a plurality of activities and restrictions, whereby said plurality of warning indicators regarding a plurality of activities and restrictions are based on specific geographical locations, and

b) displaying one of said plurality of warning indicators when a user selects information about the one of said

EXHIBIT A
Page 9 of 10

plurality of warning indicators for a given geographic location, from a selection menu displayed on said display screen.

10. The method of obtaining information regarding hunting or fishing regulations in a given area utilizing a hand-held computer of claim 9 wherein the plurality of activities and restrictions is restrictions is selected from the group of: changes in hunting hours, changes in fishing hours, camping restrictions, campfire restrictions, bait restrictions, weapon restrictions, lure restrictions, shooting restrictions, park boundaries, preserve boundaries, refuges, public access areas or lack of, bag limit changes, hazardous areas, vehicle restrictions, private property, federal land, or state land locations.

* * * * *

EXHIBIT A
Page 10 of 10

## MUTUAL NONDISCLOSURE AGREEMENT

This MUTUAL NON-DISCLOSURE AGREEMENT (the *"Agreement"*) is by and between **Recreational Data Services** (*"Company"*), with a place of business located at 3330 Creekside Dr. Anchorage, AK 99518, and **Tripod Data Systems, Inc.** (*"TDS"*), with its principal place of business at 345 SW Avery Avenue, Corvallis, OR 97333, (each a *"Party"* and collectively the *"Parties"*).

**RECITALS**

A. The Parties desire to assure the protection and preservation of the confidential and/or proprietary nature of information, which may be Disclosed or made available to each other for the limited purpose of discussing the terms of a prospective business relationship (*"Purpose"*). In the course of the Parties' discussions relating to the Purpose, the Parties expect that each is or may become a Recipient of the other Party's Confidential Information, as defined below.

B. The Parties intend by this Agreement, among other things, to limit the manner and extent to which each Recipient may use or Disclose the other Party's Confidential Information.

C. In consideration of the Parties' mutual promises below, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

**AGREEMENT**

1. Definitions.

1.1. *"Others"* shall mean any individual or entity not a Party.

1.2. *"Confidential Information"* shall mean any information or material of a confidential or proprietary nature relating to the existing or prospective business and/or technology of a Party or Others or to the Purpose. Confidential Information includes, but is not limited to a Party's business, customer, technical or engineering information.

1.3. *"Disclosing Party"* shall mean the Party that makes a Disclosure of information to the Recipient.

1.4. *"Disclose"* shall mean to communicate in writing; electronically; in machine readable form; by demonstration; by access to plans, diagrams or equipment; or orally, either directly, or through a Party's agents. Derivatives of the word "Disclose" (e.g., Disclosure, Discloses, etc.) shall have substantially the same meaning.

1.5. *"Recipient"* shall mean the Party that receives a Disclosure of a Disclosing Party's Confidential Information, whether from the Disclosing Party or otherwise.

2. Exclusions. Notwithstanding any other provisions of this Agreement, each Party acknowledges that Confidential Information shall not include any information which:

2.1. Is already known by Recipient prior to the Disclosure without restriction on Disclosure;

2.2. Is independently developed by or for the Recipient without breach of this Agreement;

2.3. Becomes publicly known through no wrongful act of Recipient;

2.4. Is lawfully received, without obligation of confidentiality, by Recipient from Others;

3. Designation of Confidential Information. Each Disclosing Party shall affix or incorporate in any written Confidential Information it Discloses to a Recipient an appropriate statement identifying the information as the Disclosing Party's Confidential Information, such as "[name of Party] Confidential Information" or words of like meaning. If the Confidential Information is orally disclosed, the Disclosing Party must indicate the confidential nature of the information at the time of disclosure and confirm in writing, that such information was confidential and proprietary within thirty (30) days of making such an oral disclosure of Confidential Information.

4. Obligations of Confidence. Except as expressly permitted or further restricted by Paragraph 5, each Party agrees as Recipient of an Disclosing Party's Confidential Information that it will:

4.1. Not Disclose such Confidential Information to Others.

4.2. Exercise the same degree of care to protect such Confidential Information from any possession, use or Disclosure not expressly permitted by this Agreement, that the Recipient generally uses to protect its own information of similar nature, but no less than a reasonable standard of care.

5. Permitted Possession, Use and Disclosure. Each Disclosing Party's Confidential Information may be possessed, used and Disclosed by a Recipient only as follows:

5.1. Possession and Use. A Recipient may possess, use and reproduce such Confidential Information solely for the purpose of the Purpose and having discussions between the Parties relating to the Confidential Information or the Purpose. Such use shall not include Disclosure except as expressly permitted below. The Parties agree that nothing in this Agreement prohibits competition of the Parties in the marketplace.

5.2. Disclosure.

5.2.1. Employees and Consultants. A Recipient may Disclose such Confidential Information to its employees, legal and financial advisors, and consultants on a strict "need to know" basis and solely for the use specified above in Paragraph 5.1, provided that each such person to whom such Disclosure is made is notified of the confidential nature of the Disclosure and agrees in advance not to use or Disclose such Confidential Information except as expressly permitted by the terms of this Agreement. Notwithstanding the above, the recipient of Confidential Information may disclose Confidential Information to (1) employees of its parent company or, (2) employees of a wholly-owned subsidiary of its parent company or, (3) employees of the recipient of Confidential Information's wholly owned subsidiaries, provided that such employees have a need to know for the purposes of this Agreement and are under an obligation to hold such information in confidence.

5.2.2. Required Disclosures. Disclosure of any Confidential Information by a Party hereunder shall not be precluded if such Disclosure is required by the Recipient pursuant to court or administrative order, but only to the extent required and provided that the Recipient in each instance before making such Disclosure first (i) promptly upon receipt of such order notifies the other Party of such order; and (ii) cooperates with the other Party in making, if available under applicable law, a good faith effort to obtain a protective order or other appropriate determination against or limiting Disclosure or use of the Confidential Information, at no cost to Recipient.

5.3. Return or Destruction of Confidential Information. Upon conclusion of the Purpose, the Recipient shall, at the

Disclosing Party's option, either: (a) promptly destroy all copies of the written Confidential Information in its and its representatives possession and confirm such destruction to the Disclosing Party in writing, or (b) promptly deliver to the Disclosing Party all copies of the written Confidential Information in its and its representatives' possession.

6. Miscellaneous.

6.1. Each Party warrants that it has the right to Disclose all Confidential Information provided under this Agreement and agrees to indemnify and hold harmless the other Party from any liability arising from a breach of this warranty. Furthermore, the Parties agree that the Confidential Information provided by either Party to the other Party is provided "as is." No other warranties with respect to Confidential Information are made by either Party.

6.2. The Recipient acknowledges that remedies at law may be inadequate to protect the Disclosing Party against any actual or threatened breach of this Agreement by the Recipient or by its representatives and, without prejudice to any other rights and remedies otherwise available to the Disclosing Party, the Recipient agrees to the granting of injunctive or other equitable relief in the Disclosing Party's favor, without proof of actual damages.

6.3. Each Party certifies and warrants that such Party will not export, directly or indirectly, the other Party's Confidential Information or any portion thereof in violation of any relevant law or regulation, including without limitation any law or regulation of the United States government or any agency thereof.

6.4. Nothing in this Agreement shall operate to create or transfer an ownership or other interest in any Confidential Information, nor require the Disclosure by a Disclosing Party of any of its Confidential Information, nor restrict, inhibit or encumber any Disclosing Party's right or ability to dispose of, use, distribute, Disclose or disseminate in any way its own Confidential Information or to release or modify by further agreement the obligations of any Recipient or Others with respect to such Disclosing Party's Confidential Information.

6.5. Nothing herein shall obligate either Party to enter into any business arrangements or agreements with the other Party. The terms of confidentiality under this Agreement shall not be construed to limit either Party's right to independently develop or acquire products without use of the other Party's Confidential Information. The Disclosing Party acknowledges that the Receiving Party may currently, or in the future, be developing information internally, or receiving information from other . that is similar to the Confidential Information. Accordingly, nothing in this Agreement will be construed as a representation or agreement that the Receiving Party will not develop or have developed for its products, concepts, systems or techniques that are similar to, or compete with, the products, concepts, systems or techniques contemplated by or embodied in the Confidential Information provided that the Receiving Party does not violate any of its obligations under this Agreement in connection with such development.

6.6. This Agreement shall be effective as of the date the Agreement is fully executed and shall continue for a period of one (1) year thereafter unless terminated earlier by written notice from one Party to the other. Either Party may terminate this Agreement at any time with or without cause upon notice to the other Party. The obligation of confidence and non-use set forth under this Agreement shall be for five (5) years from the date of Disclosure despite any earlier termination of this Agreement. Neither Party may disclose the existence or terms of this Agreement without the prior express written consent of the other Party.

6.7 Should any provision of this Agreement be deemed illegal or otherwise unenforceable, that provision shall be severed and the remainder of this Agreement shall remain in full force and effect

6.8. Neither Party may transfer or otherwise assign its rights, duties or obligations under this Agreement to any other person or entity, in whole or in part, without the prior written consent of the other Party.

6.9. If a legal action between or among any Parties arises from this Agreement or the conduct of any Party with respect to any Disclosing Party's Confidential Information, a prevailing Party shall recover from the other Party or Parties to the action its reasonable attorney fees and costs of suit.

6.10. This Agreement shall be governed by the laws of the State of Oregon, without reference to conflict of laws principles or provisions.

6.11. No waiver or modification of this Agreement will be binding upon either Party unless made in writing and signed by a duly authorized representative of each Party.

6.12. The signatories hereto warrant and represent that they are duly authorized to bind their respective entities and to execute this Agreement.

6.13. This Agreement contains the sole and entire agreement between the Parties related to the Disclosure of Confidential Information with respect to the Purpose.

WITH INTENT TO BE BOUND, TDS and Company have executed this Mutual Nondisclosure Agreement, effective as of the later of the dates indicated below.

| TDS: | Company: |
|---|---|
| Tripod Data Systems, Inc. | Recreational Data Services, Inc |
| By: William Martin | By: [signature] |
| Printed Name WILLIAM MARTIN<br>And Title: PRESIDENT | Brian Feucht<br>President |
| Dated: 3/12/09 | Dated: 3/12/09 |

EXHIBIT B
Page 2 of 2

Friday, March 13, 2009.jpg

FREEDOM GROUP

# Remington® Sportsman™

## Smartphone

Project Code Name: Copper Center

Manufactured By: Trimble

Powered by: RDS

EXHIBIT C
Page 1 of 8

Remington. Marlin BUSHMASTER DPMS PANTHER ARMS    HARRINGTON RICHARDSON BARNES BULLETS MOUNTAIN KHAKIS EOTAC DAKOTA ARMS PARKER GUN



FREEDOM GROUP

# 5 Year Sportsman Hardware Sales

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Hunters | 58,835 | 379,385 | 472,527 | 129,563 | 6,343 |
| Fishermen | 99,639 | 642,508 | 800,247 | 219,421 | 10,743 |
| **Totals** | **158,474** | **1,021,893** | **1,272,774** | **348,984** | **17,086** |

## 2,819,211 Potential Unit Sales

The refresh rate on hardware is every 2 years, so a new model would be introduced late in the second year, which would create new volume and incremental revenue as the old model phases out, self perpetuating the product category. Next generation model volumes are not reflected here

Exhibit C
Page 2 of 8

Remington.
Marlin
BUSHMASTER

HARRINGTON RICHARDSON

BARNES

MOUNTAIN KHAKIS
EOTAC
DAKOTA ARMS



# Core Applications Units

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| **OEM Units** | 158,474 | 1,021,893 | 1,272,774 | 348,984 | 17,086 |
| **Purchased Units** | 93,500 | 602,917 | 750,937 | 205,901 | 10,081 |
| **Total Units** | 251,974 | 1,624,810 | 2,023,711 | 554,885 | 27,167 |
| **RDS Revenue** | $ 1,213,594 | $ 11,603,729 | $ 32,669,969 | $ 48,017,016 | $ 51,544,569 |
| **Remington Revenue** | $ 1,121,996 | $ 9,653,950 | $ 27,028,362 | $ 39,915,551 | $ 42,892,605 |

Assumptions:
100% of units come with unlock key for 1 free state
35% of units download 1 additional state
10% of units download 2 additional states
5% of units download 3+ additional states
Unit to Download Multiplier = .59 (net of initial free state)
YOY Renewals = 80%

- OEM units come installed (unlock key) on the phone and generated revenue for RDS at a rate of $8.00 / unit.
- Purchased units are incremental based upon the assumptions above and generate revenue for Remington and RDS at a 60:40 split.



# SDK Application Analysis

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| 3rd Party Application Units | 376,812 | 2,806,620 | 5,832,960 | 6,662,757 | 6,703,384 |
| 3rd Party Applications / Unit | 2 | 2 | 2 | 2 | 2 |
| 3th Party Application Revenue | $ 3,251,886 | $ 24,221,127 | $ 50,338,446 | $ 57,499,596 | $ 57,850,201 |
| Application Store Access (30%) | $ 975,566 | $ 7,266,338 | $ 15,101,534 | $ 17,249,879 | $ 17,355,060 |
| RDS Revenue | $ 487,783 | $ 3,633,169 | $ 7,550,767 | $ 8,624,939 | $ 8,677,530 |
| Remington Revenue | $ 487,783 | $ 3,633,169 | $ 7,550,767 | $ 8,624,939 | $ 8,677,530 |

Assumptions:

All users purchase 2 3rd party apps per year
Or this can be viewed as 20% of users purchase 1 app per / month
Average cost of 3rd Party apps is $8.63
30% of gross revenue is collected for access to app store
Revenue is split 50:50 between Remington and RDS

EXHIBIT C
Page 4 of 8













# Back Office Management

## Customer Service 1-800-Sportsman

Trimble

- Responsible for managing a call center for end-user hardware issues
- Responsible for warranty and repair
  - May generate revenue through extended warranty plans (split with carrier)
    - Current Trimble products have a warranty rate of .07%

RDS

- Responsible for managing a call center to support end-user software issues
- Responsible for managing all product support and application servers
- Responsible for managing the back end of the Remington Application Store

Carrier

- Responsible for managing a call center to support coverage / service issues

Remington

- Responsible for managing the front end of the Remington Application Store
- Remington customer service would direct phone related calls to the appropriate call center as described above

EXHIBIT C
Page 5 of 8

DAKOTA ARMS



FREEDOM GROUP

# Trimble P&L

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | 5 year total |
|---|---|---|---|---|---|---|
| Annual unit sales | 158,474 | 1,021,893 | 1,272,774 | 348,984 | 17,086 | 2,819,211 |
| Cumulative unit sales | 158,474 | 1,180,367 | 2,453,141 | 2,802,125 | 2,819,211 | |
| **HW Revenue** | **118,697,026** | **765,397,857** | **953,307,726** | **261,389,016** | **12,797,414** | $ **2,111,589,039** |
| COG | | | | | | |
| PCOG | 76,569,331 | 474,399,489 | 585,476,040 | 160,532,640 | 7,859,560 | |
| OCOG | 8,308,792 | 53,577,850 | 66,731,541 | 18,297,231 | 895,819 | |
| Remington Margin | 9,495,762 | 61,231,829 | 76,264,618 | 20,911,121 | 1,023,793 | $ **168,927,123** |
| **Gross margin** | **24,323,141** | **176,188,690** | **224,835,527** | **61,648,024** | **3,018,242** | |
| GM (in %) | 20.49% | 23.02% | 23.58% | 23.58% | 23.58% | |
| **Expense** | | | | | | |
| R&D | 4,747,881 | 30,615,914 | 38,132,309 | 10,455,561 | 511,897 | $ 84,463,562 |
| G&A | 2,373,941 | 15,307,957 | 19,066,155 | 5,227,780 | 255,948 | $ 42,231,781 |
| **Total expense** | **7,121,822** | **45,923,871** | **57,198,464** | **15,683,341** | **767,845** | $ 126,695,342 |
| **N.O.I** | **17,201,319** | **130,264,818** | **167,637,064** | **45,964,683** | **2,250,397** | $ **363,318,281** |
| | 14.5% | 17.0% | 17.6% | 17.6% | 17.6% | |

6

Remington. Marlin BUSHMASTER DPMS HARRINGTON RICHARDSON BARNES MOUNTAIN KHAKIS EOTAC DAKOTA ARMS PARKER GUN

EXHIBIT C
Page 6 of 8

FREEDOM GROUP

# RDS P&L

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | 5 year total |
|---|---|---|---|---|---|---|
| Annual unit sales | 158,474 | 1,021,893 | 1,272,774 | 348,984 | 17,086 | 2,819,211 |
| Cumulative unit sales | 158,474 | 1,180,367 | 2,453,141 | 2,802,125 | 2,819,211 | |
| Zone SW initial purchase | 1,267,792 | 8,175,144 | 10,182,192 | 2,791,872 | 136,688 | |
| Zone SW User 1st Year | 1,869,993 | 12,058,337 | 15,018,733 | 4,118,011 | 201,615 | $ 33,266,690 |
| Zone SW User continuing | | 4,031,579 | 30,028,536 | 62,407,907 | 71,286,060 | |
| 3rd party apps | 975,566 | 7,266,339 | 15,101,536 | 17,249,882 | 17,355,186 | $ 57,948,509 |
| Initial data sales | 396,185 | 1,532,840 | 1,909,161 | 523,476 | 25,629 | $ 4,387,291 |
| Update data sales | | 150,550 | | | | |
| **Software Revenue** | **4,509,536** | **33,214,789** | **72,240,159** | **87,091,148** | **89,005,178** | $ **286,060,810** |
| | | | | | | |
| **COG** | | | | | | |
| Zone SW | 1,121,996 | 9,653,950 | 27,028,362 | 39,915,551 | 42,892,605 | $ **120,612,463** |
| 3rd party apps | 487,783 | 3,633,170 | 7,550,768 | 8,624,941 | 8,677,593 | $ **28,974,255** |
| Total COGS | 1,609,779 | 13,287,119 | 34,579,130 | 48,540,492 | 51,570,198 | $ **149,586,718** |
| | | | | | | |
| **Remington's Revenue** | 1,213,594 | 11,603,729 | 32,669,969 | 48,017,016 | 51,544,569 | $ **145,048,877** |
| | 26.9% | 34.9% | 45.2% | 55.1% | 57.9% | |
| | | | | | | |
| **Gross margin (RDS)** | **2,899,757** | **19,927,670** | **37,661,029** | **38,550,656** | **37,434,980** | $ 136,474,092 |
| GM (in %) | 64.30% | 60.00% | 52.13% | 44.26% | 42.06% | |
| | | | | | | |
| **Expense** | | | | | | |
| R&D+G&A+Ops | 5,108,970 | 4,891,685 | 4,915,420 | 4,945,522 | 4,945,522 | $ 24,807,119 |
| | | | | | | |
| **Total expense** | **5,108,970** | **4,891,685** | **4,915,420** | **4,945,522** | **4,945,522** | $ 24,807,119 |
| **N.O.I** | (2,209,213) | 15,035,985 | 32,745,609 | 33,605,134 | 32,489,458 | $ 111,666,973 |
| | -49.0% | 45.3% | 45.3% | 38.6% | 36.5% | |

Remington. Marlin BUSHMASTER DPMS PANTHER ARMS HARRINGTON RICHARDSON BARNES BULLETS MOUNTAIN KHAKIS EOTAC DAKOTA ARMS PARKER GUN

EXHIBIT C

Page 7 of 8

FREEDOM GROUP

# Remington P&L

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | 5 year total |
|---|---|---|---|---|---|---|
| **Annual unit sales** | 158,474 | 1,021,893 | 1,272,774 | 348,984 | 17,086 | **2,819,211** |
| **Cumulative unit sales** | 158,474 | 1,180,367 | 2,453,141 | 2,802,125 | 2,819,211 | |
| Gross HW revenue | 118,697,026 | 765,397,857 | 953,307,726 | 261,389,016 | 12,797,414 | **$ 2,111,589,039** |
| Gross SW revenue | 4,509,536 | 33,214,789 | 72,240,159 | 87,091,148 | 89,005,178 | $ 286,060,810 |
| **Total gross revenue** | 123,206,562 | 798,612,646 | 1,025,547,885 | 348,480,164 | 101,802,592 | **$ 2,397,649,849** |
| | | | | | | |
| **Remington revenue** | | | | | | |
| HW Revenue | **9,495,762** | **61,231,829** | **76,264,618** | **20,911,121** | **1,023,793** | **$ 168,927,123** |
| SW Revenue | 1,213,594 | 11,603,729 | 32,669,969 | 48,017,016 | 51,544,569 | **$ 145,048,877** |
| **Total revenue** | 10,709,356 | 72,835,558 | 108,934,587 | 68,928,137 | 52,568,362 | **$ 313,976,000** |
| **Marketing** | | | | | | |
| Pre-launch | 600,000 | | | | | |
| TV (47.62% of marketing) | 2,001,579 | 13,612,966 | 20,359,874 | 12,882,669 | 9,825,027 | |
| Prints (23.8% of total mrkt) | 1,001,325 | 6,810,125 | 10,185,384 | 6,444,781 | 4,915,142 | |
| Web (4.8% of total mrkt) | 200,265 | 1,362,025 | 2,037,077 | 1,288,956 | 983,028 | |
| Others (23.8% of total mrkt) | 1,501,452 | 6,810,125 | 10,185,384 | 6,444,781 | 4,915,142 | |
| **Total marketing** | 5,304,620 | 28,595,240 | 42,767,719 | 27,061,187 | 20,638,339 | **$ 124,367,105** |
| | | | | | | |
| **Remington net revenue** | 5,404,736 | 44,240,318 | 66,166,868 | 41,866,951 | 31,930,023 | **$ 189,608,895** |
| **Remington margin %** | 50.5% | 60.7% | 60.7% | 60.7% | 60.7% | **60.4%** |
| **% of gross sales** | 4.4% | 5.5% | 6.5% | 12.0% | 31.4% | **7.9%** |

Remington. Marlin BUSHMASTER DPMS HARRINGTON RICHARDSON BARNES MOUNTAIN KHAKIS EOTAC DAKOTA ARMS PARKER GUN

EXHIBIT C
Page 8 of 8

**Christopher Cyphers**

| | |
|---|---|
| **From:** | Chaur-Fong Chen <Chaur-Fong_Chen@Trimble.com> |
| **Sent:** | Monday, December 06, 2010 1:18 PM |
| **To:** | Curtis McQueen |
| **Cc:** | Mary Duncan; Brian Feucht |
| **Subject:** | Re: Per Friday's phone conversation |

Curtis,
It was great to have a chance catch up with you last Friday.
We have made steady progress on the Copper Center Project (Trimble/Remington/RDS's outdoor recreation solution). The project involves many parties and therefore carries tremendous complexity for the team to address. We are in the process to have upper management from all parties get together to start the legal discussion. One of the partners, Remington has a recent change in key management position (the CEO) and is in the final stage to fill the position. Remington's board would like to have the new CEO takes the ownership of the project, since this is a substantial project for all parties involved. I agree and also believe this is a sensible business decision for the project. Remington is anticipating to fill the position between now and Q1 next year. While we are waiting for the new Remington's CEO, we will be working with Verizon to define a business relationship (we have previously met with AT&T to outline the potential business arrangement). The team will also conducting another comprehensive national survey to re-qualify the market potential and product adoption scenarios.

Since the Copper Center device is the foundation of the MDS product, we do need to have Copper Center Project in place before we can moving MDS project forward. I believe we should be able to go back to further the MDS discussion in February 2011. Meeting with Senator Begich's office could happen earlier since it is a critical supporting event to strengthen our believe for providing opportunity and solution to your organization, tribal, and VA communities.

Thank you very much for your patience and continuous support.

Chaur-Fong

On Dec 6, 2010, at 10:19 AM, "Curtis McQueen" <Curtis@eklutnainc.com> wrote:

> Chaur-Fong,
>
> As we discussed, please send me a e-mail letting me know what I can share with our Board at tomorrow's Board meeting on the progress and current status of our project with Trimble and when we will be resuming discussions. I will share your analogy of the duck as well. ☺
>
> Best regards,

EXHIBIT D
Page 1 of 2

**Curtis J. McQueen**

*Chief Executive Officer*

**<image003.jpg>**

16515 Centerfield Dr., Ste. 201
Eagle River, AK 99577

P: 907.696.2828

F: 907.696.2845

www.eklutnainc.com

**DISCLAIMER:**

This e-mail message (including any appended material) contains confidential information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us at (907) 696-2828 and ask to speak to the message sender. Also, we would appreciate your forwarding the message back to us and deleting it from your system. Thank you.

This e-mail and all other electronic (including voice) communications from the sender's corporation are for informational purposes only. No such communication is intended by the sender to constitute any agreement by the sender to conduct a transaction by electronic means. Any such intention or agreement is hereby expressly disclaimed unless otherwise specifically indicated. To learn more about our corporation, please visit our website at http://www.eklutnainc.com.

Steve Wolff - Trimble CFO

RDS.

| Scenario | Assumptions | Valuation | % Revenue Goal | COGs | Expense | Licence Exp |
|---|---|---|---|---|---|---|
| 1 | • 75% revenue goal | $38.5 MM | 75% / 235.4 MM | 138 MM | $23.2 | $30.2 |
| 2 | • 47% Rev goal | $18.4 MM | 47% / 148 M | $86.5 | $23.2 | $18.9 |
| 3 | • Cut staff after year 1 | $0 MM | 17% / 52.9 | 30.8 | $10.4 MM | $6.8 MM |
| 4 | • Cut staff after year 2 | ($5.7) MM | 5% / 15 MM | $1.2 MM | $10.5 MM | $2 MM |

EXHIBIT E
Page 1 of 1

**THIS AGREEMENT** ("Agreement") is entered into this 11 day of February 2011 by and between RECREATIONAL DATA SERVICES, INC., an Alaskan corporation, having an office at 7100 Homer Dr., Anchorage, AK , 99504, ("RDS") and CABELAS INCORPORATED, a DELAWARE corporation, having an office at One Cabela Dr. Sidney NE 69160 ("CABELA'S"). Collectively, RDS and CABELA'S are herein after referred to as "Party" or "Parties" as the sense of the text requires.

**WHEREAS,** the Parties to this Agreement are Transmitter or Receiver as the sense of the paragraph requires, and they wish to disclose certain of their Proprietary Information, as defined below, for the purposes and uses recited herein.

**NOW, THEREFORE,** in order to induce such transfer, the Parties agree as follows:

**Purpose:** ___**Copper Center**___________________________________

1. Proprietary Information shall mean any information and data provided to Receiver by Transmitter hereunder, including but not limited to proprietary, technical, developmental, marketing, sales, operating, performance, cost, know-how, business and process information, computer programming techniques, and all record bearing media containing or disclosing such information and techniques, which is disclosed pursuant to this Agreement. Proprietary Information shall include without limitation any drawings, specifications, schematics, samples, models or prototypes, or parts thereof.

2. Transmitter agrees to make known to Receiver, and Receiver agrees to receive Proprietary Information solely for use in connection with the purposes recited above and for no other purposes whatsoever.

3. All Proprietary Information delivered pursuant to this Agreement:

(a) shall if in written or physical form (including information stored in electronic data systems or in storage media), be marked "Proprietary" or "Confidential", or with a similar legend by Transmitter before being turned over to Receiver;

(b) shall if orally disclosed, be reduced to written form identifying the items of Proprietary Information and delivered to the Receiver within thirty (30) days of such oral disclosure;

(c) shall not be copied, distributed, disclosed, or disseminated outside of Receiver's business organization, except as expressly allowed herein, in any way or form by Receiver without the prior written consent of Transmitter;

(d) shall be maintained in confidence using the same degree of care which Receiver employs with respect to its own Proprietary Information, but in no event maintained with less than a reasonable standard of care, and may only be disclosed to those employees of Receiver who have a need to know the same in order to use the same for the purposes recited above, and have been informed of the obligations of this Agreement; or as necessary in accordance with government rules and/or regulations or by order of a court or governmental agency; or in the case of Cabela's, to employees of its parent, companies under common control and affiliated companies who have a need to know the same in order to advise Cabela's with respect to the purposes of this Agreement and who agree to observe the obligations hereof;

(e) shall not be used by Receiver for any purposes, except as expressly stated herein, without the express prior written permission of Transmitter; and,

EXHIBIT F
Page 1 of 3

(f) shall remain the property of and be returned to Transmitter (along with all copies thereof, including all copies stored in electronic data systems) within thirty (30) days after receipt by Receiver of a written request from Transmitter, and upon expiration of this Agreement. At the conclusion of the use of Proprietary Information received from Transmitter, or termination of this Agreement as set forth elsewhere in this Agreement, Receiver shall ensure that all copies of all Proprietary Information, whether or not incorporated in other programs, data compilations, or otherwise intermingled with data not subject to this Agreement, shall be removed from all electronic data systems and storage media.

4. The obligations of paragraph 3 shall not apply however to any information which:

(a) is already in the public domain at the time of disclosure or later becomes available to the public through no breach of this Agreement by Receiver;

(b) was, as between Transmitter and Receiver, lawfully in Receiver's possession prior to receipt from Transmitter without obligation of confidentiality;

(c) is received by Receiver independently from a third party without obligation of confidentiality; or,

(d) is independently developed by Receiver, as evidenced by its business records.

5. Proprietary Information shall not be deemed to be in the public domain merely because any part of said information is embodied in general disclosures or because individual features, components or combinations thereof are now or become known to the public.

6. Unless mutually agreed otherwise in writing, Receiver's obligations hereunder with respect to each item of Proprietary Information shall terminate three (3) years from the longer of the date of the receipt thereof by Receiver or the termination date.

7. Receiver shall have the right to refuse to accept any information under this Agreement and nothing herein shall obligate Transmitter to disclose to Receiver any particular information.

8. Unless mutually agreed otherwise in writing, the Parties hereto shall not be obligated under the terms hereof to compensate each other for disclosures of any information under this Agreement and agree that no warranties of any kind are given by Transmitter with respect to such information or any use thereof.

9. Transmitter and Receiver shall have no obligation to enter into any further agreement with each other except as each, in its sole judgment, may deem advisable. It is understood that no patent, copyright, trademark or other proprietary right or license is granted by this Agreement. The disclosure of any Proprietary Information and materials which may accompany the disclosure shall not result in any obligation to grant Receiver rights therein.

10. The primary but not exclusive points of contact for the transmission and control of Proprietary Information exchanged hereunder are:

| | |
|---|---|
| For: Cabela's Incorporated<br>One Cabela Drive<br>Sidney, NE 69160 | For: RDS<br>7100 Homer Dr.<br>Anchorage, AK 99504 |
| Attn: Thomas Millner | Attn: Brian Feucht |

Exhibit F
Page 2 of 3

E-Mail: THOMAS.MILLNER@CABELAS.COM E-Mail: bfeucht@aoialaska.com

11. This Agreement shall be effective as of the date recited on the first page hereof. It may be terminated, with or without cause, with respect to further disclosures upon five (5) days prior notice in writing. This Agreement shall automatically terminate one (1) year from its effective date. The rights and obligations accruing prior to termination as set forth herein, shall, however, survive the termination as specified in this Agreement.

12. This Agreement represents the entire understanding and agreement of the Parties and supersedes all prior communications, agreements, and understandings relating to the subject matter hereof. The provisions of this Agreement may not be modified, amended, nor waived, except by a written instrument duly executed by both Parties. This Agreement may not be assigned by either Party without the prior written consent of the other Party, except to a successor in ownership of the entire business to which this Agreement relates, who shall expressly assume in writing the performance of the terms and conditions of this Agreement. This Agreement is made subject to and shall be construed under the laws of the State of North Carolina, without regard to its conflict of laws provisions.

13. The Parties each agree that they will not, without the prior written consent of the other Party, directly or indirectly solicit any employee of the other Party or induce any employee to leave the other's employment during the term of this Agreement or for a period of one (1) year after the termination or expiration of this Agreement.

14. Any and all export and re-export from the United States of America of any Technical Data or Commodities hereunder shall be made pursuant to such laws and regulations applicable thereto, including the U.S.A. Export Administration Act and any regulations issued pursuant thereto.

**IN WITNESS WHEREOF**, the Parties hereto represent and warrant that they have the authority to cause this Agreement to be executed in duplicate by their duly authorized representatives.

CABELA'S INCORPORATED

By: [signature]

Name: Thomas Millner

Title: CEO

RDS INC.

By: [signature]

Name: Brian Feucht

Title: President

EXHIBIT F
Page 3 of 3

TRIMBLE OUTDOORS

Tempe, Arizona

"We're proud to see our GPS technology helping people enjoy the great outdoors and cultivate active, healthy lifestyles."

— Larry Fox, Director of Business Development, Trimble Outdoors

Better Tracked Trimble Navigation Ltd. has a long track record of using GPS technology to increase efficiencies in the agriculture, engineering and construction industries. Several years ago, Trimble's leaders asked a question: Could they apply that same technology to their love of the outdoors and desire for an active lifestyle? And the answer was Trimble Outdoors.

The Trimble Outdoors vision was born at about the same time that AT&T formed its own vision of how mobile data communications could dramatically expand the capabilities of mobile devices well beyond simply making phone calls. The result has been a strong relationship, reinforced by AT&T's open and collaborative approach to working with developers.

"Our colleagues at AT&T were willing to invest the time and resources to help us realize our vision," says Larry Fox, director of business development at Trimble Outdoors. "And they've offered more than dedicated product management resources to help us deploy our apps on wireless devices. They've also worked with us to launch our products, raise awareness and mature our business strategy."

The outcome of this collaboration is a suite of mobile applications — Trimble Outdoors®, AllSport GPS and Geocache Navigator® — that enables athletes and outdoor enthusiasts not only to find their way while out on the trail but also to document trips, share photos and video, and even track workouts and calories burned.

AT&T's collaboration with Trimble is just one example of how AT&T is imagining new possibilities and collaborating with developers to bring fresh capabilities to wireless devices.

EXHIBIT G
Page 1 of 1



Cabela's Recon Hunt App now available!

Contact Customer Service
1-800-237-4444

Shop Cabelas.com | Find a Store | Search

## RECON HUNT APP

- Made For Hunters
- Go Anywhere
- Stay Found
- Collect Data
- Plan & Prepare

LEARN MORE

## Meet the first iPhone and Android navigation app specifically designed for hunters.

With Recon Hunt, you can find hunting spots on detailed maps, track wildlife, take trophy photos and backtrack home. Recon Hunt also tracks other essentials as well: weather forecasts, sun and moon phases, trip stats and ballistics information. Plus, Recon Hunt works in remote places without the need of data and cellular signals.

Hunting | Archery | Shooting Gear | Dog Supplies | Optics | Electronics | Men's Hunting Clothing

Men's Casual Clothing | Women's Clothing | Kids' Clothing | Footwear | Fishing | Fly-Fishing
Boating | Camping | Auto & ATV | Food & Food Prep | Home & Cabin | Gifts & Hobbies
Bargain Cave | Gift Cards

Join Cabela's on:  

This e-mail was sent to you by: Cabelas.com, One Cabela Dr., Sidney, NE 69160

Read Cabela's Privacy Policy.

EXHIBIT H
Page 1 of 6

SEARCH All Products FOR keyword or item number FIND

Contact Customer Service 1-800-237-4444

Sign in to CLUB Visa Account

Home Find a Store Gift Cards Gift Shop Catalog Quick Order (order by item number)

Hunting Shooting Fishing Boating Camping Auto & ATV Clothing Footwear Home & Cabin Hobbies BARGAIN CAVE

You are Here: Recon Hunt

## Recon Hunt

Plan a Trip
Share a Trip
Tutorials
FAQ

## Cabela's Account

Login
Register

## Mobile Apps

Recon Hunt for Android

Recon Hunt for iPhone

RELATED CATEGORIES

Men's Hunting Clothing
Women's Hunting Clothing
Kid's Camo & Hunting Clothing
Ammunition
Shooting
Food Processing

SEE ALSO

Gun Library
Hunting Trips
ATV Shop
Outdoor Information
Free Catalogs

RECON HUNT
TUTORIALS
LEARN MORE
PAUSE II

CELEBRATE WITH US HERITAGE SWEEPSTAKES

web exclusive deals SHOP NOW Dozens of items in all categories!

Limited-time offers

## My Recon Trips

**Sign up. It's FREE.**

Cabelas.com Users

LOG IN

New To Cabelas.com

CREATE ACCOUNT

**Online mapping tools**
Topo maps • Find hunting spots

**Go mobile**
Sync trips to Recon Hunt app

**My trips**
Share stories • Post photos

**Deals**
News • Sale alerts • Coupons

### Plan a Hunting Trip

**Step 1**

Name and describe your next hunt.

START NOW

**Step 2**

Find hunting spots on maps. Mark points. Draw tracks.

**Step 3**

Open saved trips in your Recon Hunt mobile app.

APP TUTORIALS

Learn more about Cabela's Recon Hunt.

### Tell Your Story

CREATE A TRIP

USE RECON HUNT

EDIT MY TRIPS

Share your stories and photos at cabelas.com

FAQ

Our answers to frequent questions.

FIFTY YEARS FIFTY TRUCKS
SWEEPSTAKES Presented by VISA
ENTER NOW

EXHIBIT H
Page 2 of 6

CUSTOMER SERVICE
Cabela's 144
©1998-2011 Cabela's Inc. All Rights Reserved.
Cabela's Privacy Policy Special Notices
Use made subject to terms of The Cabela's Recon End User License ABOUT US
Track Your Order
Return Policy
Shipping Info
Legendary Guarantee
Security Certificate
Pricing/Specifications
Gun Restrictions
Learn more about the new features on cabelas.com

SHOPPING RESOURCES
Bargain Cave
Retail Stores
Gift Cards
Catalog Quick Order
Free Catalog
International Shopping
Sizing Charts
Customer Reviews
Site Map

CABELAS CLUB
Cabela's CLUB Visa
Pay My Visa
Cabela's CLUB REWARDS
Our History
Investor Relations
Careers
Cabela's Television
Cabela's Magazine
Conservation Partners
Corporate Partners
Sponsored Events

OTHER DEPARTMENTS
Gun Library
Boats & Boat Centers
ATV Shops
Outdoor Adventures
Travel Service
Trophy Properties
TAGS
Corporate Sales
Government Outfitters
New Product Division

CABELA'S E-MAIL SIGN-UP
Our e-mail is filled with deals, news, sneak previews, top-rated products, e-mail only specials and more
enter e-mail address
CONTINUE

OUTDOOR INFORMATION
Articles & Information
Talk Forums
Game & Fish Info
Trophy Room
Pro-Staff
Find us on Facebook
follow us on twitter
Affiliate Programs

EXHIBIT H
Page 3 of 6

# iTunes Preview

What's New What is iTunes How To

## Cabela's Recon Hunt By Trimble Navigation Limited

View More By This Developer

Open iTunes to buy and download apps.

$4.49
Category: Sports
Updated: 01 July 2011
Current Version: 1.2
1.2
Size: 18.9 MB
Language: English
Seller: Trimble Navigation Limited
© 2011 Trimble Navigation Limited
Rated 4+

Requirements: Compatible with iPhone 3G, iPhone 3GS, iPhone 4, iPad Wi-Fi + 3G and iPad 2 Wi-Fi + 3G. Requires iOS 4.0 or later.

### Customer Ratings

We have not received enough ratings to display an average for the current version of this application.

All Versions:
5 Ratings

### More iPhone Apps by Trimble Navigation Limited

AllSport GPS
View In iTunes

AllSport GPS LE
View In iTunes

### Description

NEW! See public land boundaries and hunting zones in 11 states, including AZ, CA, CO, ID, MT, NM, NV, OR, UT, WA, and WY. Try it free for 7 days

Cabela's Recon Hunt is the first mobile navigation app built solely for hunters. With Recon Hunt, you can find hunting spots on detailed maps, track wildlife, take trophy photos and backtrack home. Recon Hunt also tracks other essentials as well: weather forecasts, sun and moon phases, trip stats and ballistics information. Our power saver technology monitors how you use the app in order to preserve battery power. Plus, Recon Hunt works in remote places without the need of data and cellular signals.

GO ANYWHERE
- Recon Hunt uses the GPS built into your iPhone to track your location with GPS satellites. No data or phone signal is needed to see your current location or to mark points.
- View unlimited topographic maps in the United States and Canada. Topo maps are 1:24K scale in the Lower 48, 1:63K in Alaska, and 1:50K in Canada.
- Consult street maps, terrain maps, and satellite photos for more info.
- Store up to 500MB of map quads on your iPhone for offline viewing and fast load times in the field.

STAY FOUND
- Follow your track on seamless maps. Zoom in, zoom out. Know where you are at all times.
- Navigate with the digital compass. Choose between Magnetic North and True North. (Note: Magnetic Compass only works on iPhone 3GS and 4)
- Use the Goto feature to navigate from your current location to a saved or manually entered coordinate.

COLLECT DATA
- Mark waypoints of your favorite (or secret) spots like a hunting blind, treestand, game trails or where you parked your truck.
- Record unlimited tracks. See where and how far you have traveled.
- Capture photos and videos (3GS and 4 only). The Recon Hunt app geotags your media to an exact location on a map.
- Record bugling elk, gobbling wild turkeys or other sounds with the audio recorder.
- See 15+ trip stats, including mileage, speed, elevation, direction, elevation gain/loss, and GPS position.

PLAN & PREPARE
- View Sun and Moon phases by date and location.
- Read the five-day weather forecast. See the current humidity, heat index, dew point, wind chill, wind speed and direction.

ONLINE MAPPING TOOLS
- Use our online mapping tools at cabelas.com/recon to scout hunting lands and to preplan for your next hunt.
- View detailed topo, aerial, street, and terrain maps on your computer screen.
- Mark waypoints like your hunting blind, water sources, and fence lines. Draw routes into wild lands or on remote forest roads.
- Auto-sync your private online trips with your Recon Hunt phone app.
- Keep trips private or check the share option to showoff trips to hunting buddies and the cabelas.com community.
- And much more.

MADE FOR HUNTERS
- Get exclusive in-app deals and coupons from Cabela's.
- Turn on Blood Trailing to track blood spots after the shot.
- Disable beeps and noises in the app.
- See ballistics details and graphs for 850+ pistol and rifle cartridges.
- Save precious battery power. Recon Hunt carefully manages battery life based on how you use it.
- Add color-coded public land boundaries and hunting zones to your Recon Hunt maps. Coverage includes 11

EXHIBIT H
Page 4 of 6



Backpacker GPS Trails
View In iTunes

Map the Spill
View In iTunes

BACKPACKER GPS Trails Lite
View in iTunes

states: AZ, CA, CO, ID, MT, NM, NV, OR, UT, WA, and WY.
• Enter the shooting range for your weapon and see the kill zone from your current location

Notes: Continued use of GPS running in the background can dramatically decrease battery life. Recon Hunt is designed and optimized for the iPhone 4, 3GS, and 3G. The 1st generation models lack a GPS chip required to run the application.

COMING SOON
• Share trips on Facebook and Twitter.
• And more...

Tell us what you think about the app and learn more at: www.cabelas.com/recon.

Trimble Navigation Limited Web Site Cabela's Recon Hunt Support

## What's New In Version 1.2

This release adds public land boundaries and hunt zones to your maps. Know your location and what land you are on at all times. Details:

*See public land boundaries in 11 states: AZ, CA, CO, ID, MT, NM, NV, OR, UT, WA, and WY.
*Boundaries include national forests, national parks, BLM lands, state lands, national wildlife refuges, Indian lands, and more.
*Try these new map layers for free for 7 days.

## iPhone Screenshots

## Customer Reviews

Jody
by Joe 117755

A really good app. And the maps work well in south eastern oz

BWILLIAMS
by BatFars1995

Great but I haven't figured out how to change the measurements from imperial (feet, inches and Mph) to metric (meters and kilometers). :/

EXHIBIT H
Page 5 of 6

## Customers Also Bought

Primos Hunting Ca...
Sports
View In iTunes

iSolunar™ Hunting
Sports
View In iTunes

Ducks Unlimited, I...
Sports
View In iTunes

Outdoor
Sports
View In iTunes

iHunt Sounds & Ca...
Sports
View In iTunes

**iTunes (AU)** on Facebook
Like 20,021

**App Store** on Facebook
Like 2,632,773

Become a fan of the iTunes and App Store pages on Facebook for exclusive offers, the inside scoop on new apps and more.

iTunes

iTunes
Download iTunes 10
What is iTunes?
How Tos

More iTunes
Digital Music Basics
iTunes Ping
Airplay
iTunes Gifts
iPod + iTunes Support
Accessibility

Partner with iTunes
Overview
Content Providers
Companies and Organisations

iTunes Store
Browse iTunes Store
Browse App Store
Buy Music Now
Buy iTunes Gift Cards
Redeem iTunes Gift Cards
iTunes Corporate Sales
Free Single of the Week
New On iTunes
iTunes Plus
Music Requests

Shop the Apple Online Store, call 133 MAC (622), visit an Apple Retail Store or find a reseller.

Site Map Hot News Contact Us

Copyright © 2010 Apple Pty Ltd. All rights reserved. Terms of Use Privacy Policy

EXHIBIT H
Page 6 of 6